UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CASE NO. 4:24-cr-371-S |
| v. | § | |
| | § | |
| KAMAIGA GHOLAR (18) | § | |
| JAMES BATESON (48) | § | |
| KATHERINE O'BRIEN (52) | § | |

## United States' Response in Opposition to Defendants' Motions for Judgments of Acquittal

The United States files this brief in opposition to the Motion for Judgment of Acquittal (Docket Entry No. 1422) filed by Defendant Katherine O'Brien (52) and orally joined by Defendants Kamaiga Gholar (18) and James Bateson (48).

## The Superseding Indictment was Sufficiently Pled

Defendants point out that while the wire fraud counts in the Superseding Indictment incorporate by reference the introductory paragraphs 1-11, they do not incorporate paragraphs 12-14. Defendants also note that the conspiracy counts do not incorporate the introductory paragraphs. *See* Docket Entry No. 1422 ("Mot.") at 1 and 3-4. Defendants explain the exact origin of the typographical errors and acknowledge that paragraphs 1-11 are holdovers from the original indictment. *Id*. at 2. According to Defendants, the information in the introductory paragraphs 12-14 contain "necessary elements" of wire fraud whose "incorporation must be expressly

1

done" under Fifth Circuit law, and as such, the Superseding Indictment fails to state an offense. *Id*. at 3.[1]

The United States disagrees that any count against any Defendant on trial was deficiently pled or missing an essential element. "An indictment is sufficient if it contains the elements of the charged offense, fairly informs the defendant of the charges against him, and ensures that there is no risk of future prosecutions for the same offense." *United States v. Harms*, 442 F.3d 367, 372 (5th Cir. 2006) (citing *United States v. Sims Bros. Constr., Inc.*, 277 F.3d 734, 741 (5th Cir. 2001)) (internal quotation marks omitted).

"'[I]t is well settled that an indictment must set forth the offense with sufficient clarity and certainty to apprise the accused of the crime with which he is charged.' The test for sufficiency is 'not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards.'" *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004).

---

[1] As a preliminary matter, Rule 29 governs only the sufficiency of the evidence at trial to support the crime charged. *See* Fed. R. Crim. P. 29(a). Rule 12(b)(3)(B)(v) requires a motion for failure to state an offense be raised prior to trial. *See* Fed. R. Crim. P. 12(b), Advisory Committee Comments, 2014 Amendments ("Rule 12(b)(3)(B) has also been amended to remove language that allowed the court at any time while the case is pending to hear a claim that the 'indictment or information fails . . . to state an offense.'"). If the motion is untimely, the court may consider the request "if the party shows good cause." Fed. R. Crim. P. 12(c)(3). No such good cause has been shown.

Simply put, the sufficiency of an indictment "is judged by whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *United States v. Lavergne*, 805 F.2d 517, 521 (5th Cir. 1986). "An indictment is intended to provide notice to the defendant that allows her to intelligently consider her defense or plea." *United States v. Grant*, 850 F.3d 209, 214 (5th Cir. 2014) (internal brackets omitted). Generally, "an indictment that closely tracks the language under which it is brought is sufficient to give a defendant notice of the crimes with which he is charged." *See United States v. Franco*, 632 F.3d 880, 884-85 (5th Cir. 2011). The counts in the Superseding Indictment track the statutory language and allege the elements of the offense.[2]

The Fifth Circuit has held that "so long as an indictment as a whole 'fairly imports' an element, 'an exact recitation of [that] element . . . is not required.'"

---

[2] The general substance of the allegations in paragraphs 12-14 of the Superseding Indictment are also contained in paragraphs 1-11. A bondsman can act as an agent of an insurance company and that Defendant Muharib was an agent of Financial Casualty & Surety. *See* Superseding Indictment at ¶¶ 2, 5-6. The insurance company then conducts a review process, which required co-signers to provide documentation and sign a promissory note. *See id*. at ¶¶ 3 and 7. The documentation was fraudulent and falsified and allowed defendants to pay less money, and the defendants conspired to do so. *See id*. at ¶¶ 4 and 9-10. 18 U.S.C. § 1349 does not require proof of an overt act in furtherance of the conspiracy. *United States v. Njoku*, 737 F.3d 55, 67 (5th Cir. 2013).

*United States v. Dentler*, 492 F.3d 306, 309 (5th Cir. 2007). The United States does not need to exactly recite the elements. As a result, the Superseding Indictment "as a whole 'fairly import[ed]'" paragraphs 12-14. *Harms*, 442 F.3d at 372; *see also United States v. Stevenson*, 832 F.3d 412, 425-26 (3d Cir. 2016) (acknowledging that a required element in a count can be alleged by "necessary implication" and the question to be answered is whether the defendant has been sufficiently "informed . . . of the nature of the charges against him [or her]") (internal quotation marks and citation omitted).

Furthermore, as the Defendants recognize, the typographical errors at issue—in which the introductory paragraphs that had been added to the Superseding Indictment were omitted from each express incorporation—were readily apparent from the face of the Superseding Indictment.[3] Defendants cannot claim any surprise that the United States presented evidence at trial in accordance with these introductory paragraphs, much less undue surprise. By explaining the origin of the paragraph numbers, the Defendants recognize that the paragraph numberings were clerical errors. "Clerical or drafting errors [ . . . ], which should cause no confusion, do not prejudice the defendant." *United States v. Sprick*, 233 F.3d 845, 854 (5th Cir. 2000) (noting that although the indictment inadvertently omitted words, a reasonable

---

[3] In fact, the Superseding Indictment numbers the introductory paragraphs as paragraphs 1-14 and then restarts at paragraph 12 for Count 1.

defense attorney would realize the drafting error and would proceed accordingly); *United States v. Steen*, 55 F.3d 1022, 1026-27 (5th Cir. 1995) (stating "[p]ractical rather than technical considerations govern resolution of [indictment] challenges and we will not reverse for minor deficiencies which do not prejudice the accused") (quoting *United States v. Chappell*, 6 F.3d 1095, 1099 (5th Cir. 1993)). The Superseding Indictment is sufficiently pled.

### The Scheme to Defraud

The evidence at trial showed each Defendant knowingly and willingly engaged in a scheme to submit falsified co-signer information in support of a surety bond on behalf of a Harris County inmate. In the case of the Nicholas Yoder bond, Defendant Gholar submitted falsified employment information on behalf of two other co-signers. In the case of the James Palladina bond, Defendant Bateson submitted falsified employment information on his own behalf. In the case of the Roemello Burros bond, Defendant O'Brien submitted falsified employment information on behalf of four co-signers and made *additional* misrepresentations that Identity Theft Victim B.M. and Identity Theft Victim K.O. were willing to co-sign at all.

Each scheme allowed the respective Harris County inmate to qualify for a surety bond with a 10% cash deposit rather than a cash bond with a 100% cash

deposit.[4] Each scheme directly targeted the property interests of an identified victim, Financial Casualty & Surety Inc. (FCS), the insurance company with which AABLE Bail Bonds (AABLE) partnered. Each scheme also financially benefited the members of the scheme by allowing the Harris County inmate to secure release without having to pay 100% of the value of his bond (representing a 90% savings per inmate).

Due to the number and seriousness of the charges, the combined bond amounts in these cases were high: $335,000 in the case of Nicholas Yoder,[5] $520,000 in the case of James Palladina,[6] and $430,000 in the case of Roemello Burros.[7] As the Court heard from FCS counsel, Ken Good, these amounts all exceeded AABLE's independent underwriting authority of $150,000 and therefore required "large bond approval."[8] Mr. Good further testified that FCS would not have approved the bonds had it known that key co-signer information (such as income and a personal connection to the inmate) was false.

---

[4] David Kern testified to the types of bonds available in Harris County and explained that 10% is the standard amount that bail bond companies require for a surety bond.

[5] GE 39.

[6] GE 79.

[7] GE 100.

[8] The Palladina and Burros large bond approval forms are in evidence. GE 82, GE 100.

Mr. Good explained that when FCS issued a surety bond on behalf of an inmate, that bond represented an obligation to pay the court the amount of the bond in the event of default. If AABLE did not make that payment for any reason, then the obligation to pay would fall upon FCS—as happened in many instances after AABLE collapsed under the weight of its own mismanagement. Mr. Good testified that FCS to date has suffered approximately $1.5 million to $2 million in losses since the collapse of AABLE, with bond forfeiture judgments comprising the bulk.

Mr. Good also provided an example of how seemingly harmless inaccurate co-signer information can directly affect FCS's ability to stave off a bond forfeiture. He explained that sometimes the answer for a missed court date can be as simple as calling a loved one to re-establish a connection with the defendant, bring him back into court, and resolve the prior failure to appear. But FCS cannot avail itself of such recourse when the co-signer paperwork is inaccurate or, worse, the co-signer has been faked as in the case of Defendant O'Brien.

In other words, FCS promised to pay Harris County $335,000 if Nicholas Yoder did not show up to court; FCS promised to pay Harris County $520,000 if James Palladina did not show up to court; and FCS promised to pay Harris County $430,000 if Roemello Burros did not show up to court. FCS was fraudulently induced to make these promises based upon the knowing and deliberate falsehoods of Defendants and their co-conspirators.

7

To the extent Defendants argue that no scheme was proven based upon Mr. Good's testimony that the Yoder, Palladina, and Burros bonds were all discharged with no loss to FCS, "the wire fraud statute is agnostic about economic loss." *United States v. Kouisisis*, 145 S. Ct. 1382, 1392 (2025). What the law requires instead is a scheme to "'obtain' the victim's 'money or property,' regardless of whether [the defendant] seeks to leave the victim economically worse off." *Id.* (quoting 18 U.S.C. § 1343).

To be absolutely clear, each fraudulent surety bond issued in these cases was in effect a chit that could have been called upon. They were outstanding financial liabilities for FCS until the underlying criminal cases had been resolved. They were property interests.

During oral argument on the Defendants' motion, Defendant O'Brien cited several cases for the proposition that bail bonds are not property. These cases actually support the position of the United States. Although not contextually relevant—none discusses what constitutes a property interest for purposes of the wire fraud or a related criminal statute—they implicitly recognize that the cash bonds and surety bonds under discussion are valuable property of the parties who posted them. *See, e.g., United States v. Parr*, 594 F.2d 440, 443 (5th Cir. 1979) (discussing how a third party who provides the cash deposit for another's bond would ordinarily be the one entitled to its return, not the person on whose behalf it

was deposited). Moreover, multiple courts have held that loan guarantees and similar promises to pay constitute cognizable property interests for purposes of the wire fraud and related statutes. *See, e.g., United States v. Griffin*, 76 F.4th 724, 739 (7th 2023) (recognizing that Small Business Administration (SBA) loan guarantees, which "would not have been granted if the true facts had been made known" and "committed the SBA to stand behind a significant portion of the loan amount in case of default," were "most certainly 'property' as required by the wire fraud statute"); *United States v. Madeoy*, 912 F.2d 1486, 1492 (D.C. Cir. 1990) (similar, concerning a Federal Housing Administration insurance commitment, in which "the Government promises to pay the lender if the borrower defaults on the loan"). These examples are closely analogous to the type of property interest before the court.

Because Defendants and their co-conspirators were successful at duping FCS into issuing surety bonds, Nicholas Yoder, James Palladina, and Roemellos Burros were able to secure their freedom from Harris County at a discounted 10% rate on their bond amounts. Thus, the evidence at trial established a scheme to defraud which *both* targeted the property interests of FCS *and* financially benefited the co-conspirators by allowing them to pay a 10% cash bond rather than the 100% cash bond that the law otherwise required.

### Interstate Nexus

The evidence at trial showed it was reasonably foreseeable to Defendants and their co-conspirators that the co-signer packets they provided to AABLE would be the subject of wire transmissions in the ordinary course of business. "For a defendant to be convicted of wire fraud, it is sufficient that the defendant could reasonably have foreseen the use of the wires; the interstate nature of the wire communication need not have been reasonably foreseeable." *United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000).

Importantly, the key consideration is that Defendant acted knowing or reasonably foreseeing that the use of the wires would "follow in the ordinary course of business." *See Pereira v. United States*, 347 U.S. 1, 8-9 (1954). It is not necessary that the use of the wires follow a particular defendant's act immediately in time; only that the Defendant acted with knowledge or foresight that the wire would later occur in the ordinary course of business.

### Uploads Occurred in the "Ordinary Course of Business"

At trial, the Court heard about AABLE's contractual and legal recordkeeping requirements. First, by law, AABLE was required to keep certain key bond records (including co-signer applications and agreements) for at least four years after case

disposition, meaning the resolution of the underlying criminal case.[9] Second, under its contract with FCS, AABLE was required to keep the documents for at least five years after their execution.[10]

When the FBI took AABLE's paper files in 2022, FCS became concerned about AABLE's ability to comply with these record-keeping obligations. FCS conducted an audit and confirmed that AABLE's digital files on BondPro satisfied the law and its contract.[11] In fact, files related to each bond before the Court (notably co-signer applications) were uploaded to BondPro within approximately one month of the inmate being released from Harris County Jail.[12] BondPro was the office management software used by AABLE. It is a product of Orbiting Code, Inc., whose servers are located in Georgia.[13]

From this evidence, it is clear AABLE uploaded co-signer applications to BondPro in the ordinary course of business, following the issuance of every bond. This action by necessity took place *after* the issuance of the bond or group of bonds,

---

[9] Testimony of Ken Good; Testimony of David Kern.

[10] GE 2; Testimony of Ken Good.

[11] Testimony of Ken Good.

[12] *Compare* GE 44 *with* GE 40 (Yoder upload 26 days after release); *compare* GE 78 *with* GE 80 (Palladina upload 32 days after release); *compare* GE 83 *with* GE 101 (Burros upload 22 days after release).

[13] Testimony of Nora Mendoza.

so that all paperwork could be completed—including notably the paperwork required of the inmate released.[14]

### Uploads Were Foreseeable to Defendants and Furthered the Scheme

Defendants may try to characterize these practices as either unforeseeable to them, or as post-scheme and not in furtherance of the fraud.[15] But the evidence told a different story.

The co-signer paperwork that each Defendant signed was clear. Defendants were entering into a continuing relationship with AABLE. They were warned that AABLE would attempt to collect fees from co-signers if the released inmate ever missed court; that the co-signer was required to update phone and address information going forward; and that the co-signer was obligated to bring the released inmate to AABLE within 24 hours of release from Harris County.[16] Defendants were under no misapprehension that their relationship with AABLE/FCS ceased upon

---

[14] GE 39; GE 79; GE 100; GE 105D.

[15] Certain demonstrative exhibits created by the case agent identified the release dates for each Harris County inmate as the conclusion of the related wire fraud conspiracies. These dates conflict with the Superseding Indictment and do not control. The evidence presented at trial controls.

[16] GE 16 & 19 (Co-Signer Packets Completed by Defendant Gholar); GE 74 (Defendant Bateson Co-Signer Packet); GE 89-92 & 104 (Co-Signer Packets Completed by Defendant O'Brien). Importantly, as facilitators of their respective conspiracies, Defendants Gholar and Defendant O'Brien completed multiple co-signer packets and were exposed to the warning statements in the packet many times over (more than **five times over** in the case of Defendant O'Brien).

turning in their paperwork. Likewise, their fraudulent scheme did not cease when they succeeded in getting their loved one released.

In fact, Defendant O'Brien and her co-conspirator Roemello Burros were challenged on the lies in her paperwork *even after Burros was released*. When Burros visited AABLE to sign paperwork, AABLE employees questioned him about the co-signers on his bond. They were concerned because Burros's own father did not know many of Burros's co-signers. Burros reassured AABLE that he knew his co-signers through Defendant O'Brien.[17] As the Court now knows, of course, some of these co-signers had not agreed to co-sign at all. Burros lied to AABLE to cover for Defendant O'Brien and continue her deception. Telling the truth would have risked his continued freedom on the fraudulent bond. Defendant O'Brien knew that Burros had covered for her, as seen by her recounting the story to law enforcement in April 2024.[18]

These factual details matter. To evaluate whether a defendant should reasonably expect a wire to follow in the ordinary course of business following his or her deceptive act, *Pereira*, 347 U.S. at 8, it is necessary first to ground the wire in the context of the type of transaction that the fraud targeted. Defendants' fraudulent schemes targeted bail bonds. The Court should therefore take into account what

---

[17] GE 105D.
[18] GE 105D.

wires were foreseeable and likely to occur "in the ordinary course of business" with regards to bail bonds.

Was it reasonably foreseeable to Defendants and their co-conspirators that AABLE would keep a digital record of the factual representations and promises that they made to spring their loved ones from Harris County jail at a 90% reduced rate? For AABLE's own purposes and in order to have these records available to FCS and the state? The answers to these questions are clearly yes.

In addition to being foreseeable, the wires need also to have furthered the fraudulent schemes. It is not necessary that the use of the wires constituted an "essential element" of the fraudulent schemes. Wires that were "incident to an essential part" or "a step in the plot" will suffice. *See United States v. Manges*, 110 F.3d 1162, 1169 (5th 1997) (internal quotation marks and citation omitted).

Here, the BondPro uploads furthered the fraudulent schemes by "papering" the respective bonds and making them appear legitimate from the surface. Thus, the wires served a similar purpose in these schemes as the otherwise "innocent" and "routine" mailings found sufficient in *United States v. Schmuck*, 489 U.S. 705, 714-15 (1989).

In *Schmuck*, the defendant was a used car distributor whose scheme involved rolling back odometers and selling cars with artificially low mileage at inflated prices to other dealers, who then resold the cars to retail customers. *See* 489 U.S. at

14

707. The defendant was charged with mail fraud based upon mailings of title application forms by the defendant's dealer customers when they sold the cars to retail customers. *See id*. The defendant argued that these mailings were not part of his scheme, which concluded when he succeeded in offloading the cars to his dealer customers. *See id*. at 711. The Supreme Court disagreed, noting that the defendant had a vested interest in maintaining appearances and good relations with his dealer customers so that his fraudulent business practices could continue. *See id*. at 711-12 ("A rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relationship with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their Wisconsin customers.").

The same reasoning applies in the context before the Court. Just because the inmates were released did not mean that the fraudulent schemes were complete. Each released inmate had a vested interest in remaining free on the bond he fraudulently obtained. It is no wonder that when Roemello Burros was questioned at AABLE about his cosigners, he lied. After all, the Court heard what happened in the Curtis Holliday case when FCS began to suspect that it had been duped to issue a bond based on fake co-signer information. It immediately reported its suspicions to the Harris County court overseeing the Curtis Holliday criminal case so that appropriate

action could be taken.[19] Should similar suspicions have arisen in the cases of Nicholas Yoder, James Palladina, or Roemello Burros due to failure to complete a step "'incident to an essential part of the scheme,'" *Schmuck*, 489 U.S. at 712 (quoting *Pereira*, 347 U.S. at 8), these released inmates risked being taken back into custody.

The conspirators in the Yoder/Gholar scheme had an especially strong interest to not deviate from the ordinary course of business, as that conspiracy involved complicit AABLE employees Mary Brown (1)[20] and Oscar Wattell (2)[21]. Those employees were earning fees under the table.[22] As repeat players in fraudulent conduct (both charged and uncharged), they in particular would not have wanted to draw undue suspicion from FCS and potentially threaten their secondary source of illicit income. *See United States v. Allen*, 76 F.3d 1348, 1363 (5th Cir. 1996) (recognizing that "actions taken to avoid detection, or to lull the fraud victim into company, can further the fraud").

 In summary, the evidence at trial showed that Defendants and their co-conspirators knew or reasonably should have known that the fraudulent co-signer

---

[19] Testimony of Ken Good.

[20] GE 4, 4A, & 4B.

[21] GE 6 & 6A; *see also* GE 43D & 43E; *see also* Testimony of Kamaiga Gholar.

[22] GE 4, 4A, & 4B.

16

applications they provided to AABLE would be the object of wire transmissions in the ordinary of business, and that these wire transmissions were incident to an essential part of their fraudulent scheme.

### Conclusion

For these reasons, the United States respectfully requests that the Court deny the Defendants' motions for judgments of acquittal.

Respectfully Submitted,

NICHOLAS J. GANJEI
United States Attorney
Southern District of Texas

By:    */s/ Stephanie Bauman*
Michael Day
Stephanie Bauman
Assistant United States Attorneys
1000 Louisiana, Suite 2300
Houston, Texas 77002
713-567-9000

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been delivered on counsel of record by e-mail.

*/s/ Stephanie Bauman*
Stephanie Bauman
Assistant United States Attorney

17