United States District Court
Southern District of Texas

**ENTERED**

October 15, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | |
| | § | CRIMINAL NO. H-24-371 |
| MARY BROWN, *et al.*, | § | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

A grand jury indicted fifty-three defendants for conspiracy to commit and for committing wire fraud in a scheme to obtain bail bonds based on false statements of cosigners' finances and employment. Three defendants—Kamaiga Gholar, James Bateson, and Katherine O'Brien—waived their right to a jury and agreed to a bench trial. (Docket Entry No. 1340). The court held a five-day bench trial from September 29, 2025, to October 6, 2025. The court finds Ms. Gholar, Mr. Bateson, and Ms. O'Brien guilty, beyond a reasonable doubt, of conspiracy to commit wire fraud and of committing wire fraud, as charged in the superseding indictment. The court's findings of fact and conclusions of law are set forth below.[1]

## I.     Background Allegations

The May 2025 superseding indictment alleges that employees of a Houston-based bail bonds company, Aable Bonds, conspired with others to falsify and to obtain falsified cosigner financial and employment reports to qualify defendants jailed on criminal charges for bail bonds. (Docket Entry No. 890 ¶ 10). The indictment alleges that when a third party cosigns a contract between a detainee and the bail bond company, the cosigner becomes an additional party to the

---

[1] To the extent any of the conclusions of law are findings of fact, they should be considered findings of fact. To the extent any of the findings of fact are conclusions of law, they should also be considered conclusions of law.

bail bond contract, enabling an incarcerated individual to be released on bond by paying a percentage of the amount set by the court. (*Id.* ¶¶ 3–4). The indictment alleges that the coconspirators falsified cosigners' financial and employment reports and recruited straw cosigners, who submitted false financial and employment information for the cosigner documents. (*Id.* ¶ 10). The indictment alleges that the coconspirators transmitted the bond and consigner documents (or caused them to be transmitted) by electronic means, including to Bond-Pro, a provider of remote computing services located in Georgia, as well as to the government and the insurance companies issuing the surety bond. (*Id.* ¶¶ 5, 11). The indictment alleges that Financial Casualty & Surety and other insurance companies relied on the fraudulent financial and employment information to underwrite the surety bonds and decide whether to assume the risk of paying the full bond amount if the incarcerated individual violated the bond conditions and forfeited the bond. (*Id.* ¶¶ 1, 12).

The superseding indictment alleges that Kamaiga Gholar (Counts 9 and 14), James Bateson (Counts 39 and 42), and Katherine O'Brien (Counts 45 and 46) conspired to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349, and committed wire fraud, in violation of 18 U.S.C. §§ 2(a), 1343. The indictment alleges that their actions were part of an illegal scheme to use false information to release on bond individuals detained at the Harris County Jail. The indictment alleges that the codefendants and others used false information to obtain from licensed bond and insurance companies financial guarantees to Harris County that the bonds would be paid if the released individuals forfeited them. The indictment alleges that the bond and insurance companies would not have agreed to issue and underwrite the bonds if the bond and cosigner applications had contained truthful information.

The indictment alleges that Gholar falsified pay stubs and other documents to support a bail bond for Nicholas Yoder, a co-defendant and alleged coconspirator, (*id.* ¶¶ 15–17); that Bateson falsified pay stubs and other documents to support a bail bond for James Palladina, a co-defendant and alleged coconspirator, (*id.* ¶¶ 39–41); and that O'Brien falsified pay stubs and other documents to support a bail bond for Roemello Burros, a co-defendant and alleged coconspirator, (*id.* ¶¶ 42–44). The parties waived a jury and tried these allegations before the court.

## II.    The Legal Standards

### A.    The Legal Standards for Criminal Cases

"In a case tried without a jury, the court must find the defendant guilty or not guilty. If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." FED. R. CRIM. P. 23(c). The court must weigh the evidence, determine the credibility of the witnesses, and find the facts. *See United States v. Pitts*, 428 F.2d 534, 536 (5th Cir. 1970); *United States v. Jennings*, 726 F.2d 189, 190 (5th Cir. 1984); *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987).

Criminal defendants are assumed innocent until proven guilty. *United States v. Walker*, 861 F.2d 810, 811–14 (5th Cir. 1988) (per curiam). The government must prove each element of an alleged offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). To have a "reasonable doubt" means to have "a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case." FIFTH CIR. PATTERN (CRIM.) JURY INSTRUCTIONS § 1.05 (2024) [hereinafter PATTERN INSTRUCTIONS]. Proof "beyond a reasonable doubt" is "proof of such a convincing character that [the factfinder] would be willing to rely and act upon it without hesitation in making the most important decisions." *Id.*

Although criminal defendants do not need to prove their innocence, the Sixth Amendment guarantees that they may defend themselves; it guarantees the right to "confront[] . . . the witnesses against" them, "to have compulsory process for obtaining witnesses in [their] favor, and to have the Assistance of Counsel for [their] defence." U.S. CONST. amend. VI. These rights may aid criminal defendants in showing "that the government has not proven each element of an offense beyond a reasonable doubt" or establishing "an affirmative defense"— that is, "a valid justification or excuse"—"for the otherwise unlawful conduct, rendering [them] not guilty." *United States v. Garza-Flores*, No. 2:20-cr-953, 2021 WL 5771866, at *3 (S.D. Tex. Dec. 5, 2021) (citing *United States v. Ortiz*, 927 F.3d 868, 873–74 (5th Cir. 2019)).

When criminal defendants go "the first route by seeking to negate an element of the charged crime, the government retains the burden of proving that element beyond a reasonable doubt." *Id.* (first citing *Smith v. United States*, 568 U.S. 106, 110 (2013); and then citing *Ortiz*, 927 F.3d at 873–74). When criminal defendants go the second route "by seeking to 'excuse conduct that would otherwise be punishable' but not 'controverting any of the elements of the defense itself, the [g]overnment has no constitutional duty to overcome the defense beyond a reasonable doubt.'" *Id.* (quoting *Smith*, 568 U.S. at 110). Instead, criminal defendants bear "the initial burden of production" on an affirmative defense, and the government must negate the defense "[i]f and only if the defendant has met his burden of production." *United States v. Branch*, 91 F.3d 699, 714 n.1 (5th Cir. 1996). Criminal defendants must prove their affirmative defenses by a preponderance of the evidence. *United States v. Ramcharan*, 83 F. App'x 667, 670 (5th Cir. 2003) (per curiam).

### B.    Wire Fraud

Title 18, United States Code, Section 1343, makes it a crime for anyone to use interstate wire communications in carrying out a scheme to defraud. The government must prove four

elements beyond a reasonable doubt: (1) that "the defendant knowingly devised or intended to devise any scheme to defraud"; (2) that "the scheme to defraud employed false material representations"; (3) that the defendant transmitted or caused to be transmitted by way of wire communications, in interstate commerce, any writing for the purposes of executing such scheme; and (4) that "the defendant acted with a specific intent to defraud." PATTERN INSTRUCTIONS, *supra*, § 2.57. The Fifth Circuit's pattern jury instructions explain these offense elements:

> A "scheme to defraud" means any plan, pattern, or course of action intended to deprive another of money or property or bring about some financial gain to the person engaged in the scheme.
>
> A "specific intent to defraud" means a conscious, knowing intent to deceive and cheat someone.
>
> A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation would also be "false" if it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with the intent to defraud.
>
> A representation is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.
>
> To "cause" interstate wire communications facilities to be used is to do an act with knowledge that the use of the wire communications facilities will follow in the ordinary course of business or where such use can reasonably be foreseen.

*Id.*

It is "not necessary that the government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme." *Id.* The government must prove beyond a reasonable doubt that "the defendant knowingly devised or intended to devise a scheme to defraud by means of false or fraudulent pretenses, representations, or promises that was substantially the same as the one alleged in the indictment." *Id.* The government need not "prove that the material transmitted by wire communications was itself false or fraudulent, or that the use of the interstate wire communications facilities was intended as the specific or exclusive means of

accomplishing the alleged fraud." *Id.* Instead, the government must prove "that the use of the interstate wire communications facilities was closely related to the scheme because the defendant either wired something or caused it to be wired in interstate commerce in an attempt to execute or carry out the scheme." *Id.* "The alleged scheme need not actually succeed in defrauding anyone." *Id.*

### C.    Conspiracy to Commit Wire Fraud

Title 18, United States Code, Section 371, makes it a crime for two or more persons to conspire to commit an offense against the laws of the United States. The three defendants are charged with conspiring to commit wire fraud. "A 'conspiracy' is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of 'partnership in crime' in which each member of the conspiracy becomes the agent of every other member." PATTERN INSTRUCTIONS, *supra*, § 2.15A. The government must prove three elements beyond a reasonable doubt to establish a conspiracy: (1) "the defendant and at least one other person agreed to commit the crime of" wire fraud, as charged in the indictment; (2) "the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose"; and (3) "at least one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy." *Id.* The Fifth Circuit's pattern jury instructions explain these offense elements:

> The overt act need not be of a criminal nature so long as it is done in furtherance of the conspiracy.
>
> One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him [or her] for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The government does not need to prove that the alleged conspirators entered into any formal agreement, or that they directly stated between themselves all the details of the scheme. Likewise, the government does not need to prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out. Nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator.

*Id.*

## D.    Duress

O'Brien raises a duress defense. A defendant is not guilty if her "actions were excused by duress or coercion." PATTERN INSTRUCTIONS, *supra*, § 1.38. To prove duress, a defendant must prove four elements by a preponderance of the evidence: (1) "the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded fear of death or serious bodily injury to" herself or a family member; (2) "the defendant had not recklessly or negligently placed herself in a situation where she would likely be forced to choose the criminal conduct"; (3) "the defendant had no reasonable legal alternative to violating the law, that is a reasonable opportunity both to refuse to do the criminal act and also to avoid the threatened harm"; and (4) "a reasonable person would believe that by committing the criminal action, she would directly avoid the threatened harm." *Id.*

Fifth Circuit "precedents 'make it clear that the defense only arises if there is a real emergency leaving no time to pursue any legal alternative.'" *United States v. Mora-Carrillo*, 80 F.4th 712, 715 (5th Cir. 2023) (quoting *United States v. Posada-Rios*, 158 F.3d 832, 874 (5th Cir. 1998)), *cert. denied*, 144 S. Ct. 704 (2024). "Any rule less stringent than this would open the door

to all sorts of fraud." *The Diana*, 74 U.S. (7 Wall.) 354, 361 (1868).  "The defendant must be in serious danger 'at the moment' he commits the offense; fear of future harm is insufficient."  *Mora-Carrillo*, 80 F.4th at 715 (quoting *United States v. Harper*, 802 F.2d 115, 118 (5th Cir. 1986)).

## III.    Findings of Fact and Conclusions of Law

After weighing the evidence, determining the credibility of the witnesses, and finding the facts, the court finds and concludes that all three defendants are guilty, beyond a reasonable doubt, of having committed each element of the offenses charged.

### A.    Kamaiga Gholar (Counts 9 and 14)

The grand jury indicted Kamaiga Gholar for committing and conspiring to commit wire fraud by causing "a wire transmission of falsified documents in support of a bail bond, in order to obtain a bail bond for Co-Defendant Nicholas Yoder (13), who was detained at the Harris County Jail," in violation of 18 U.S.C. §§ 2(a), 1343, 1349.  (Docket Entry No. 890 ¶¶ 15–17).  The government proved both crimes beyond a reasonable doubt.

#### 1.    Wire Fraud (Count 14)

The government proved beyond a reasonable doubt that Kamaiga Gholar committed each element of the wire-fraud offense alleged in Count 14 of the superseding indictment.

First, Gholar knowingly devised a scheme to defraud.  PATTERN INSTRUCTIONS, *supra*, § 2.57; *Kousisis v. United States*, 145 S. Ct. 1382, 1390 (2025).  Gholar made fraudulent misrepresentations to Aable and Financial Casualty, which caused them to guarantee to Harris County that they would pay Nicholas Yoder's bond if Yoder failed to appear in court.

A criminal defendant may obtain a pretrial bond in Harris County in one of four ways. (9/29 Tr. at 26 (Kern)).  First, the criminal defendant may obtain a general-order bond from a court. (*Id.*).  General-order bonds are used in low-level misdemeanor cases, typically cost under $1,000,

and usually do not require the defendant to pay cash up front. (*Id.*). Second, a defendant may be released on personal recognizance by a court on a pretrial bond, with no upfront cost to the defendant. (*Id.*). Third, a defendant may obtain a cash bond, which is paid to the Sheriff's Office. (*Id.* at 26–27 (Kern)). A cash bond requires immediate payment in full. (*Id.* at 27 (Kern)). The Sheriff's Office holds the bond amount until the case is resolved but keeps five percent of the bond amount, up to a maximum of $50. (*Id.*). Last, a defendant may obtain a surety bond from a licensed surety company or bail bondsman. (*Id.*). The defendant and cosigners pay a percentage of the bond amount—typically, ten percent—to secure the defendant's release. (*Id.*). Harris County obtains a $15 processing fee for each surety bond issued. (*Id.*). A surety bond is issued on the surety company's or bail bondsman's financial credit. The surety company or bail bondsman guarantees the value of the bond and suffers the financial loss if the defendant fails to appear. (*Id.* at 27–28, 58 (Kern); 10/1 Tr. at 41–42 (Good)).

Aable Bonds is a licensed bond company in Harris County. (9/29 Tr. at 31 (Kern)). It is licensed through Financial Casualty, for which it acts as an agent. (*Id.*; 10/1 Tr. at 39–40 (Good)). Gholar created cosigner applications and related documents, on behalf of herself and others, to apply for a bond from Aable that would release Nicholas Yoder from Harris County Jail. (*See, e.g.*, Gov. Exs. 24–35, 40; *see also* Gov. Exs. 36, 41 (demonstratives)). In recorded phone conversations, Gholar told Yoder that she would create and submit to Aable cosigner applications from Yoder's mother, Pamela Yoder, and Deleon Borders with false information. (9/30 Tr. at 149–53 (Hassan); *see, e.g.*, Gov. Exs. 6, 7).

Gholar used the false documents to obtain a bond from Aable, which was guaranteed by Financial Casualty. In other words, Gholar helped obtain from Aable and Financial Casualty a promise that they would pay the full amount of Nicholas Yoder's bond to Harris County if Yoder

failed to appear in court.  (9/29 Tr. at 57–58 (Kern); *see* 10/1 Tr. at 41–42 (Good) (explaining that, if Aable could not pay a forfeited bond, then Financial Casualty would)).   The cosigner applications and contracts with Aable that Gholar submitted included language explaining the financial arrangement between Yoder, the cosigners, and Aable.  (Gov. Ex. at 29, 30, 31, 34, 35; *see also* Gov. Ex. 6, 7; 10/1 Tr. at 116–133 (Hitt); Gov Ex. 36 (demonstrative)).   The cosigner applications state in the first paragraph that "applying for a bail bond . . . is a little bit like applying for a loan" because Aable "put[s] up a certain amount of money in order for the defendant to get out of jail" and because Aable can "lose [its] money if the defendant does not appear in court." (Gov. Ex. 26 at 3, Gov. Ex. 27 at 3; Gov. Ex. 28 at 3).   Aable, as an agent of Financial Casualty, guaranteed Yoder's bond amount if he failed to appear and forfeited the bond.  The cosigners promised to indemnify Aable for the bond amount if Yoder forfeited.

Such a scheme to fraudulently obtain financial guarantees from a lender to a third party can form the basis of a wire-fraud conviction.  *See, e.g.*, *United States v. Griffin*, 76 F.4th 724, 739 (7th Cir. 2023) ("These guarantees, that committed the SBA to stand behind a significant portion of the loan amount in case of default, are most certainly 'property' as required by the wire fraud statute."); *United States v. Madeoy*, 912 F.2d 1486, 1492 (D.C. Cir. 1990) (similar statements about Federal Housing Administration insurance commitments); *see also United States v. St. Gelais*, 952 F.2d 90, 92, 95–96, 98 (5th Cir. 1992) (upholding a wire-fraud conviction based on a scheme to fraudulently obtain surety bonds through promissory notes and other financial instruments procured by fraud); *Pasquantino v. United States*, 544 U.S. 349, 356 (2005) ("The right to be paid money has long been thought to be a species of property.").[2]

---

[2] The defendants argue that a bond is not money or property within the scope of the wire-fraud statute. (Docket Entry No. 1422; *see* 10/3 Tr. at 1–3 (argument)).  In support of their argument, they cite authorities stating that "the true object of a bond is to secure the presence of the defendant." *United States v. Velez*, 693 F.2d 1081, 1084 (11th Cir. 1982); *accord United States v. Parr*, 594 F.2d 440, 442 (5th Cir. 1979);

Second, Gholar's "scheme to defraud employed false material representations." PATTERN INSTRUCTIONS, *supra*, § 2.57. Gholar testified on cross-examination that the cosigner applications for Pamela Yoder and Deleon Borders contained false information. (10/3 Tr. at 28–31 (Gholar)). Borders's cosigner application falsely stated that he was employed by Turner Construction Company; the evidence showed that he was not. (*See* Gov. Ex. 16 at 4; 9/30 Tr. at 128 (Hassan); 10/1 Tr. at 113–14 (Hitt); *compare* Gov. Ex. 16 at 4, *with* Gholar Ex. 2). Similarly, Pamela Yoder's cosigner application falsely stated that she was employed by Guardian Angel Home Healthcare. (Gov. Ex. 19 at 3, 5). Michael Isaac, the payroll administrator for Guardian Angel, testified that no records appeared for Pamela Yoder in Guardian Angel's payroll system and that Pamela Yoder was not an employee of Guardian Angel. (9/30 Tr. at 105–07 (Isaac)).

The pay stubs attached to Yoder's and Borders's cosigner applications were also false. Borders was not an employee of Turner Construction; his pay stubs purporting to be from Turner Construction were fake. Pamela Yoder's pay stubs purporting to be from Guardian Angel were also false. Isaac, Guardian Angel's payroll administrator, testified that Pamela Yoder's pay stub was fake. (*Id.* at 108–110 (Isaac); *see* Gov. Ex. 19 at 22–23). He could not find evidence of the payment in Guardian Angel's system. (9/30 Tr. at 108–110 (Isaac)). He also identified how Pamela Yoder's pay stub differed from a genuine Guardian Angel pay stub, by, for example, misstating the company's name; showing a check number that does not appear on genuine

---

*United States v. Melville*, 309 F. Supp. 824, 827 (S.D.N.Y. 1970). This is true, at least from Harris County's perspective. But the defendants sought to obtain money or property from Aable and Financial Casualty, not Harris County. Criminal defendants are released from jail on a surety bond only after a licensed bondsman or insurance company, such as Financial Casualty, guarantees to Harris County that it will pay the price of a defendant's bond in the case of forfeiture. (9/29 Tr. at 36–37 (Kern); 10/1 Tr. at 29–31 (Good)). That financial guarantee, which the defendants obtained using documents with false information, forms the basis of the wire-fraud allegations in the indictment and the government's proof at trial. (*See* Docket Entry No. 890 ¶ 1 ("The bail bond company in turn guarantees to the court that the amount set by the Judge will be paid if the defendant does not comply with the proceedings and rules of the court during the prosecution of the defendant.")).

Guardian Angel pay stubs; failing to list the pay period, which genuine Guardian Angel pay stubs include; and failing to list Medicaid and social-security tax deductions, which genuine Guardian Angel pay stubs include. (*Id.*).

Gholar knew that these cosigner applications contained false information and that the pay stubs were fake. Gholar testified on cross-examination that she knew Borders's cosigner application contained false statements when she sent it to Aable. (10/3 Tr. at 31 (Gholar)). She also acknowledged that she had stated in a recorded phone conversation that, at least for the family information in the cosigner applications, only the applicant's name had to be correct and that the rest of the family information could be false. (*Id.* at 41 (Gholar)). Gholar knew that both Yoder's and Borders's cosigner applications contained false information.

Gholar paid Jeanine Victor, a co-defendant, to create falsified pay stubs via CashApp, using "Nicholas Yoder" and "stubs" as transaction descriptions. (Gov. Ex. 37; 9/30 Tr. at 141, 157 (Hassan); 10/1 Tr. at 133–40 (Hitt)). Gholar participated in a telephone conversation in which Nicholas Yoder told her that the cosigners' pay stubs would be "cooked up." (Gov. Ex. 5A at 2). Gholar understood Nicholas Yoder to mean that the pay stubs were fake. Gholar set up and listened to a previous telephone call between Nicholas Yoder and Mary Brown, an Aable employee, (*id.*), in which Brown told Nicholas Yoder that she would accept, for a fee, fake pay stubs and cosigner information to obtain a bond to secure Nicholas Yoder's release from jail, (*see* Gov. Exs. 4A, 4B).[3] Nicholas Yoder also told Gholar that his mother's cosigner application should list her income as "93 bands," (Gov. Ex. 6A at 2) or $93,000, (10/3 Tr. at 36 (Gholar)), which is about the same

---

[3] Gholar testified that she did not listen in on the entire call and did not remember it. (10/3 Tr. at 45–46). The recording shows that Gholar was on the call when Yoder and Brown discussed procuring a bond through fake pay stubs. Gholar is active on the beginning of the call, and, after Yoder and Brown finished discussing Yoder's bond, she returned to talk to Yoder and agreed to follow his directions. (*See* Gov. Ex. 4b at 01:55–03:51, 17:40–20:59).

amount—$92,000 and $88,000—listed on the pay stubs submitted with Pamela Yoder's cosigner application, (Gov. Ex. 19 at 22, 23; 10/3 Tr. at 36–37 (Gholar)).  And Gholar, on Yoder's direction, tried to conceal the fact that she wrote both the cosigner applications for Pamela Yoder and Deleon Borders.  Gholar told Nicholas Yoder in a phone conversation before she submitted the written cosigner applications to Aable that she was "going to try to kind of write like a dude" and "send it at different times."  (Gov. Ex. 7A at 2).  The evidence shows beyond a reasonable doubt that Gholar knew that the Pamela Yoder and Borders cosigner applications contained false employment and income information.

The false information was material to both Aable's and Financial Casualty's decisions to issue a surety bond and guarantee payment to Harris County if Nicholas Yoder failed to appear in court.  Mary Brown, the Aable employee who told Nicholas Yoder that she would accept fake pay stubs in the application supporting his bond, explained that his bond application needed cosigners who could show a combined yearly income equal to the value of his $335,000 bond.  (Gov. Ex. 4B at 08:40–09:35).  Brown told Yoder that the fake pay stubs would satisfy the employment and income required to secure a bond.  (*Id.* at 09:55–10:25).  Brown explained that cosigners' employment information and pay stubs were necessary to "bypass the insurance," which is "why [she] asked [Yoder] how many bonds" he had.  (*Id.* at 13:00–13:41).  Those involved in the fraudulent scheme to defraud "knew . . . that" Aable and Fire Casualty "would likely deem" the cosigner information "important."  *Kousisis*, 145 S. Ct. at 1396 (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016)).

Ken Good, an attorney who works for Financial Casualty, (10/1 Tr. at 24–25, 90–91 (Good)), explained why it—and other "reasonable" bail insurers—"would attach importance to" cosigner information "in deciding how to proceed" with surety-bond applications, *Kousisis*, 145

S. Ct. at 1396 (citing *Universal Health Servs.*, 579 U.S. 193). Insurers take on substantial financial risk in issuing surety bonds. (10/1 Tr. at 31–33, 36–38, 65–69 (Good)). They rely on accurate information in bond applications, including cosigners' applications, to assess the risk in issuing any bond. (*Id.*). Aable, as Financial Casualty's agent, summarized and reported the risk information to Financial Casualty, including the financial and employment information that cosigners submitted. (*See id.*; *see, e.g.*, Gov. Ex. 100 at 7–8 (bond approval sheet for Romello Burros)).

Bondsmen and insurance companies depend on accurate information in bond applications. Accurate financial and employment information from cosigners is essential to assessing the cosigners' ability to pay if the incarcerated defendant violates bond conditions. False employment and salary information misrepresents the risk that insurers and bondsmen take in issuing the bond. (10/1 Tr. at 67–68 (Good)). Good testified that cosigners' "employer information and income" are the "two most important pieces of information" that the surety company receives. (*Id.* at 68–69 (Good)). Good also testified that, after reviewing the bond materials for Nicholas Yoder, Financial Casualty would not have approved the Yoder bond had it included accurate financial and indemnitor information. (*Id.* at 51–52 (Good)).

The evidence proves beyond a reasonable doubt that Gholar prepared and submitted to Aable and Financial Casualty false cosigner applications in support of Nicholas Yoder's bail bond; that she knew the family, employment, and financial information in the applications was false; and that the false information was material to Aable's and Financial Casualty's decisions to guarantee payment to Harris County if Yoder forfeited his surety bond.

Third, Gholar "caused to be transmitted by way of wire communications, in interstate commerce," the cosigner applications "for the purposes of executing" her scheme. PATTERN

INSTRUCTIONS, *supra*, § 2.57.[4]  Gholar "could reasonably have foreseen the use of the wires" to transmit the bond and cosigner application and related documents.  *See United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000) ("[T]he interstate nature of the wire communication need not have been reasonably foreseeable."); *see also United States v. Massey*, 827 F.2d 995, 1002 (5th Cir. 1987).[5]

Interstate wires were used to upload the documents for Nicholas Yoder's bond application to a server in Georgia that is maintained by Bond-Pro, a file-management company for bond companies such as Aable.  (9/30 Tr. at 2–10 (Mendoza); *id.* at 135–36 (Hassan); 10/1 Tr. at 39 (Good); *see* Gov. Ex. 40; Gov. Ex. 41 (demonstrative)).  Gholar could have reasonably foreseen this use of the wires.  The cosigner documents that she prepared and submitted to Aable are documents that Aable and Financial Casualty required to issue a bail bond.  The first paragraph of the cosigner applications explains that the documents Gholar submitted provided for legal recourse against cosigners in the event the bond is forfeited.  (Gov. Ex. 26 at 3, Gov. Ex. 27 at 3; Gov. Ex. 28 at 3).  Gholar could have reasonably foreseen that Aable would electronically store these documents in online servers for future use.  Indeed, state law requires Aable to maintain these cosigner applications for four years.  (9/29 Tr. at 79 (Kern); 10/1 Tr. at 60 (Good)); *see also* TEX. OCC. CODE ANN. § 1704.202(d)(3).

The use of the wires was "incident to an essential part of the scheme" to defraud.  *Schmuck v. United States*, 489 U.S. 705, 712 (1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)).

---

[4] The evidence shows that Gholar used wires in several ways as part of her wire-fraud scheme.  She sent the cosigner applications via electronic mail to Aable bonds, and she sent money via Cash App in exchange for the fake pay stubs in those applications.  (*See* Gov. Exs. 36, 37).  The government, however, did not introduce evidence that these wire transmissions were interstate.  *Cf. United States v. Hoffman*, 901 F.3d 523, 546 (5th Cir. 2018) ("The jury heard direct testimony that Yahoo emails had to leave the state.").

[5] The court relies on cases about the mail-fraud statutes because the Supreme Court construes the mail-fraud and wire-fraud statutes together.  *Kousisis*, 145 S. Ct. at 1390 n.2.

First, the cosigner applications and contracts were essential to obtaining Financial Casualty's guarantee of the bond amounts. Without the ability to store the cosigner documents for future use, Financial Casualty would have no recourse to recover the $335,000 it would owe Harris County if Yoder failed to appear. (10/1 Tr. at 40–41, 67–69 (Good)). Financial Casualty also would not possess information, such as information about the cosigners' or defendants' families, that would enable it to recover if the bond was forfeited. (*Id.* at 32–33, 38–39, 50–51, 54–55 (Good)). Second, Aable's contracts with Financial Casualty required Aable to maintain the bond documents for five years, a year longer than state law requires. (*Id.* at 48, 60 (Good)). Aable's uploading of the cosigner documents to Bond-Pro's Georgia server was the means of, and therefore "incident" to, maintaining the bond records, which was "an essential part" of the scheme to defraud.

Fourth, Gholar "acted with a specific intent to defraud." PATTERN INSTRUCTIONS, *supra*, § 2.57. Gholar "sought" Aable's and Financial Casualty's financial guarantee of the Nicholas Yoder bond "with the intent to both deceive and cheat—that is, to deprive the [victim] 'of money or property by means of deception.'" *United States v. Perez-Gorda*, 115 F.4th 653, 656 (5th Cir. 2024) (quoting *United States v. Greenlaw*, 84 F.4th 325, 351 (5th Cir. 2023)). Gholar knew that the information in Pamela Yoder's and Borders's cosigner documents was false. She also knew from the first paragraph of the cosigner applications that the false information would effect Nicholas Yoder's release from jail because Aable and Financial Casualty would guarantee $335,000 to Harris County if Yoder violated a bond condition. The record shows beyond a reasonable doubt that Gholar acted with the intent to deceive, through Aable, Financial Casualty and cheat it out of a substantial financial guarantee.

Based on the evidence presented, and after weighing the credibility of the witnesses' testimony, the court finds, beyond a reasonable doubt, that Gholar committed wire fraud, as alleged in Count 14 of the superseding indictment.

### 2.    Conspiracy to Commit Wire Fraud (Count 9)

The government proved beyond a reasonable doubt that Kamaiga Gholar committed each element of the conspiracy offense alleged in Count 9 of the superseding indictment.

First, Gholar and Nicholas Yoder "agreed to commit the crime of" wire fraud. PATTERN INSTRUCTIONS, *supra*, § 2.15A. Phone calls between Gholar and Yoder show that Gholar agreed to help Yoder obtain a surety bond by submitting to Aable false cosigner information, including fake pay stubs. (Gov. Ex. 5A at 2; Gov. Ex. 6A at 2; Gov. Ex. 7A at 2).

Second, Gholar "knew the unlawful purpose of the agreement and joined in it . . . with the intent to further the unlawful purpose." PATTERN INSTRUCTIONS, *supra*, § 2.15A. Gholar knew that Yoder sought a surety bond based on false information. Nicholas Yoder told Gholar that cosigner information for his bond was "going to be cooked up." (Gov. Ex. 5A at 2). Gholar testified that she knew Borders's cosigner application was false when she submitted it. (10/3 Tr. at 28–31 (Gholar)). Gholar joined the agreement with the intent to further the lawful purpose. She offered to "fake" her income on her cosigner application, (Gov. Ex. 6A at 2), and to conceal the fact that she had filled out Pamela Yoder's and Borders's applications with false information, (Gov. Ex. 7A at 2).

Third, Gholar "knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy." PATTERN INSTRUCTIONS, *supra*, § 2.15A. Gholar submitted the false cosigner documents to Aable, (Gov. Ex. 36 (demonstrative); *see* Gov. Ex. 7A at 2), which caused Yoder's surety bond to be approved,

(Gov. Ex. 44; 10/1 Tr. at 51–52 (Good)).  Gholar's overt acts in furtherance of the conspiracy accomplished the goals of obtaining a bail bond and effecting Yoder's release.

Based on the evidence presented, and after weighing the credibility of the witnesses' testimony, the court finds, beyond a reasonable doubt, that Gholar conspired to commit wire fraud, as alleged in Count 9 of the superseding indictment.

### B.    James Bateson (Counts 39 and 42)

The grand jury indicted James Bateson for committing and conspiring to commit wire fraud by causing "a wire transmission of falsified documents in support of a bail bond for Co-Defendant James Palladina (45), who was detained at the Harris County Jail," in violation of 18 U.S.C. §§ 2(a), 1343, 1349.  (Docket Entry No. 890 ¶¶ 39–41).  The government proved both crimes beyond a reasonable doubt.

### 1.    Wire Fraud (Count 42)

The government proved beyond a reasonable doubt that James Bateson committed each element of the wire-fraud offense alleged in Count 42 of the superseding indictment.

First, Bateson knowingly devised a scheme to defraud.  PATTERN INSTRUCTIONS, *supra*, § 2.57; *Kousisis*, 145 S. Ct. at 1390.  Bateson made fraudulent misrepresentations to Aable and Financial Casualty, which caused them to guarantee to Harris County that they would pay James Palladina's bond if Palladina violated the bond conditions.  Bateson completed a cosigner application and contract to support a bond from Aable that would release James Palladina from Harris County Jail.  (Gov. Ex. 74; 9/29 Tr. at 113 (Turner)).  Bateson helped obtain Aable's and Financial Casualty's guarantees that they would pay the amount of Palladina's bond to Harris County if Palladina failed to appear.  (9/29 Tr. at 57–58 (Kern); *see* 10/1 Tr. at 41–42 (Good)). Bateson's cosigner application explained the financial arrangement between Palladina, cosigners

18

such as himself, and Aable. (Gov. Ex. 74). Bateson's cosigner application states in the first paragraph that "applying for a bail bond . . . is a little bit like applying for a loan" because Aable "put[s] up a certain amount of money in order for the defendant to get out of jail" and because Aable can "lose [its] money if the defendant does not appear in court." (*Id.* at 5). This scheme to fraudulently secure financial guarantees satisfies the first element of a wire-fraud offense. *See, e.g.*, *Griffin*, 76 F.4th at 739; *Madeoy*, 912 F.2d at 1492; *see also St. Gelais*, 952 F.2d at 92, 95–96, 98; *Pasquantino*, 544 U.S. at 356.

Second, Bateson's "scheme to defraud employed false material representations." PATTERN INSTRUCTIONS, *supra*, § 2.57. Bateson's cosigner application included fake pay stubs that falsely reported his income. Palladina testified that he arranged for Bateson to be one of his cosigners on his surety bond and that Amir Khan, a co-defendant, would create fake pay stubs for Bateson. (9/30 Tr. at 77–78 (Palladina); Gov. Ex. 70A at 2; *see also* Gov. Ex. 69A at 2–3). On a recorded phone call, Khan told Palladina that he is "making paystubs . . . for the people who . . . Scott [Wingrove] confirmed," including "James" Bateson. (Gov. Ex. 70A at 2; *see* 9/30 Tr. at 78 (Palladina) ("Q: And when you said James, who were you referring to? A: James Bateson.")).[6] Scott Wingrove was Bateson's roommate, and he purchased drugs from Palladina. (9/30 Tr. at 74–75, 83–84 (Palladina); *see* Gov. Ex. 110).

Bateson's application included pay stubs from FAB & J Mobile Cell Repair. (Gov. Ex. 74 at 24–25). In attempting to locate the company to serve it with a grand-jury subpoena, FBI Agent Adam Hitt conducted open-source searches on the internet and reviewed Texas state filings, including those with the Texas Workforce Commission and the Secretary of State. (10/1 at 143–

---

[6] Jennifer Webb also submitted a cosigner application to support Palladina's bond. (*See* Gov. Ex. 71A at 2; Gov. Ex. 73). Webb's application included fraudulent misrepresentations, including fake pay stubs from FAB & J Mobile Cell Repair. (Gov. Ex. 73 at 23, 24).

44 (Hitt)).  Agent Hitt could not find any official or online records showing that the company existed.  (*Id.*).  Agent Hitt encountered the same difficulty with other cosigners on Palladina's surety bond.  Wingrove's application included pay stubs from CRES Custom Screens, which the government could not find to serve it with a subpoena after numerous open-source searches and reviews of business listings and Texas state filings.  (10/1 Tr. at 148 (Hitt)).  The absence of legitimate business records for both FAB & J Mobile Cell Repair and CRES Custom Screens leads to the finding that they are fictitious businesses that did not employ the cosigners, did not issue the pay stubs attached to the cosigner applications, and did not pay Bateson and Wingrove the amounts reported on the pay stubs.

Bateson introduced a letter from the Internal Revenue Service to Bateson assigning FAB & J Mobile Cell Repair an Employer Identification Number that identifies Bateson, his business accounts, tax returns, and documents.  (Bateson Ex. 3).  There are clear evidentiary issues with the document, which is a picture of a letter rather than the original letter or a complete photocopy of it.  Even accepting the letter, however, does not establish that the pay stubs Bateson attached to his application and the income reported on it were truthful.  There is no evidence—such as bank records or tax filings—of the genuineness of Bateson's pay stubs or the income reported on it.  *See Old Chief v. United States*, 519 U.S. 172, 188–89 (1997) (explaining that finders of fact may draw inferences against parties who fail to introduce usual or expected evidence); *United States v. Guzman*, 781 F.2d 428, 432 (5th Cir. 1986) (per curiam) ("[T]he government may comment on the failure of the defense . . . to counter or explain the evidence.").  The record supports finding, beyond a reasonable doubt, that Bateson attached fake pay stubs to his cosigner application and falsely reported his income to Aable and Financial Casualty.

The evidence also shows that Bateson knew that the pay stubs were fake and reported false income information. Bateson's cosigner application includes a photo of himself at Aable, as well as a copy of his driver's license. (Gov. Ex. 74 at 3–4; 9/29 Tr. at 123–24 (Turner)). Bateson signed and submitted his cosigner application to Aable. (*See* Gov. Ex. 74). Bateson reported his income to Aable and Financial Casualty knowing the information was false. The evidence shows, beyond a reasonable doubt, that Bateson's pay stubs were fake and that Bateson knew this.

The fake pay stubs were material to both Aable's and Financial Casualty's decisions to issue a surety bond and guarantee payment to Harris County if Palladina violated the bond conditions. Aable required cosigners' income to equal the value of a defendant's bond. (Gov. Ex. 4B at 08:40–09:35). The fake pay stubs supporting the cosigners' applications satisfied the employment and income required to secure a bond. (*Id.* at 09:55–10:25). The cosigners' employment information and pay stubs were necessary to "bypass the insurance." (*Id.* at 13:00–13:41). Palladina knew that "bonding companies" normally "want" their "insurance company" to "approve" bonds, which requires verification of details in bond applications. (Gov. Ex. 71A at 2). Financial Casualty considers a cosigner's employment information and income to be the most important information in determining whether it will issue a surety bond, because an insurer needs to know whether it can recover money from the cosigner in the event of a bond forfeiture. (10/1 Tr. at 31–33, 36–38, 65–69 (Good)). Good testified that, after reviewing the bond materials for James Palladina, Financial Casualty would not have approved the bond had it included accurate financial and indemnitor information. (*Id.* at 52–54 (Good)).

The record shows, beyond a reasonable doubt, that Bateson prepared and submitted to Aable and Financial Casualty a cosigner application containing false information in support of James Palladina's bail bond; that Bateson knew the financial information in the application was

false; and that the false information was material to Aable's and Financial Casualty's decision to guarantee payment to Harris County if Palladina forfeited his bond.

Third, Bateson "caused to be transmitted by way of wire communications, in interstate commerce," the cosigner applications "for the purposes of executing" his scheme. PATTERN INSTRUCTIONS, *supra*, § 2.57. Bateson "could reasonably have foreseen the use of the wires" to transmit the bond and cosigner application and related documents. *Richards*, 204 F.3d at 207; *Massey*, 827 F.2d at 1002.

Interstate wires were used to upload the documents for Palladina's bond application to a server in Georgia that is maintained by Bond-Pro. (9/30 Tr. at 2–10 (Mendoza); *id.* at 157–61 (Hassan); 10/1 Tr. at 39 (Good); *see* Gov. Ex. 80; Gov. Ex. 81 (demonstrative)). Bateson could have reasonably foreseen the use of the wires to transmit the bond documents, for the same reasons that applied to Gholar. The cosigner documents that Bateson prepared and submitted to Aable are contracts that provide Aable and Financial Casualty legal recourse if the defendant released on bond fails to appear and forfeits the bond amount. The first paragraph of Bateson's application explains this fact. (Gov. Ex. 74 at 5). Bateson could have reasonably foreseen that Aable would electronically store these documents in online servers for future use. State law requires Aable to maintain these cosigner applications for four years. (9/29 Tr. at 79 (Kern); 10/1 Tr. at 60 (Good)); *see also* TEX. OCC. CODE ANN. § 1704.202(d)(3).

The use of the wires was "incident to an essential part of the scheme" to defraud. *Schmuck*, 489 U.S. at 712 (quoting *Pereira*, 347 U.S. at 8). A reliable means of sending and storing cosigner applications and contracts was "an essential part of the scheme" to defraud Financial Casualty. Without the documents, Financial Casualty would not have issued the guarantee and would be unable to recover any of the hundreds of thousands of dollars that it would owe Harris County if

Palladina failed to appear. (Gov. Ex. 78; 10/1 Tr. at 40–41, 67–69 (Good)). State law and Aable's financial contracts with Financial Casualty required the retention of bond documents, such as Bateson's cosigner application, for several years. (10/1 Tr. at 48, 60 (Good)). Aable uploaded the cosigner documents to Bond-Pro's Georgia server as the means of, and therefore "incident" to, sending and maintaining the records, which was "an essential part" of Bateson's scheme to defraud.

Fourth, Bateson "acted with a specific intent to defraud." PATTERN INSTRUCTIONS, *supra*, § 2.57. Bateson knew that the income information in his cosigner application was false. He also knew from the first paragraph of the cosigner applications that the false information would effect Palladina's release from jail because Aable would guarantee his bond amount to Harris County. The record shows beyond a reasonable doubt that Bateson acted with the intent to "deceive" and "cheat" Aable and Financial Surety to obtain the bond that enabled Palladina's release from jail. *Perez-Gorda*, 115 F.4th at 656.

Based on the evidence presented, and after weighing the credibility of the witnesses' testimony, the court finds, beyond a reasonable doubt, that Bateson committed wire fraud, as alleged in Count 42 of the superseding indictment.

### 2. Conspiracy to Commit Wire Fraud (Count 39)

The government proved beyond a reasonable doubt that James Bateson committed each element of the conspiracy offense alleged in Count 39 of the superseding indictment.

First, Bateson, Wingrove, and Palladina "agreed to commit the crime of" wire fraud. PATTERN INSTRUCTIONS, *supra*, § 2.15A. Khan, a coconspirator, told Palladina in recorded phone calls that Wingrove confirmed that Bateson would cosign Palladina's bond application. (Gov. Ex. 70A at 2; 9/30 Tr. at 77–78 (Palladina)). Part of this scheme was that Bateson would submit

falsified pay stubs with his cosigner application. Palladina offered to pay $100 for each cosigner to "go there [to Aable]" and "sign the paper." (Gov. Ex. 72A at 2; 10/1 Tr. at 142–43 (Hitt)). Bateson submitted to Aable a cosigner application that he knew included fake pay stubs and false income information. (*See* Gov. Ex. 74 at 3–4, 24–25).

Second, Bateson "knew the unlawful purpose of the agreement and joined in it . . . with the intent to further the unlawful purpose." PATTERN INSTRUCTIONS, *supra*, § 2.15A. Bateson submitted a cosigner application with false information at Palladina's request; he knew the fraudulent nature of the conspiracy when he agreed to join and acted to further its aims. Palladina offered to pay cosigners on his bond application, including Bateson, $100 each to submit the cosigner documents to Aable. Bateson had a financial motive and the intent to further the conspiracy's unlawful goal of fraudulently obtaining Aable's and Financial Casualty's financial guarantee of Palladina's bond amount to Harris County.

Third, Bateson "knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy." PATTERN INSTRUCTIONS, *supra*, § 2.15A. Bateson submitted the false cosigner documents to Aable, (*see* Gov. Ex. 74), to obtain a surety bond for Palladina's release from jail, (Gov. Ex. 78; 10/1 Tr. at 52–54 (Good)). Bateson committed an overt act in furtherance of the conspiracy.

Based on the evidence presented, and after weighing the credibility of the witnesses' testimony, the court finds, beyond a reasonable doubt, that Bateson conspired to commit wire fraud, as alleged in Count 39 of the superseding indictment.

## C.    Katherine O'Brien (Counts 45 and 46)

The grand jury indicted Katherine O'Brien for committing and conspiring to commit wire fraud by causing "a wire transmission of falsified documents in support of a bail bond, in order to

obtain a bail bond for Co-Defendant Roemello Burros (51), who was detained at the Harris County Jail," in violation of 18 U.S.C. §§ 2(a), 1343, 1349.  (Docket Entry No. 890 ¶¶ 42–44).  The government proved both crimes beyond a reasonable doubt.

Katherine O'Brien also raised a duress defense at trial.  O'Brien failed to prove her duress defense.  Although the exhibits and testimony proved that Roemello Burros had abused O'Brien physically and mentally and threatened her, she did not establish by a preponderance of the evidence that when she committed the offense charged, she faced imminent harm if she did not do so.

### 1.    Wire Fraud (Count 46)

The government proved beyond a reasonable doubt that Katherine O'Brien committed each element of the wire-fraud offense alleged in Count 46 of the superseding indictment.

First, O'Brien knowingly devised a scheme to defraud.  PATTERN INSTRUCTIONS, *supra*, § 2.57; *Kousisis*, 145 S. Ct. at 1390.  O'Brien made fraudulent misrepresentations to Aable and Financial Casualty, which caused them to guarantee to Harris County that they would pay Roemello Burros's bond if Burros violated his bond conditions.  O'Brien completed cosigner applications with false information and fake pay stubs for herself and others—Christopher Colwell, Kristopher Thomas, Brittney McClellan, and Kathleen O'Brien, Katherine's mother—to obtain a bond from Aable and Financial Casualty that would release Burros from Harris County Jail.  (Gov. Exs. 89–92, 104; 9/29 Tr. at 158–65 (Turner)).  O'Brien helped obtain Aable's and Financial Casualty's guarantees that they would pay the amount of Burros's bond to Harris County if Burros failed to appear in court.  (9/29 Tr. at 57–58 (Kern); *see* 10/1 Tr. at 41–42 (Good)).  O'Brien's cosigner application, as well as the other applications she completed, explained the financial arrangement between Burros, cosigners such as herself, and Aable.  (Gov. Ex. 104 at 4;

Gov. Ex. 89 at 3; Gov. Ex. 90 at 3; Gov. Ex. 91 at 3; Gov. Ex. 92 at 4).  O'Brien's cosigner

application states in the first paragraph that "applying for a bail bond . . . is a little bit like applying

for a loan" because Aable "put[s] up a certain amount of money in order for the defendant to get

out of jail" and because Aable can "lose [its] money if the defendant does not appear in court."

(Gov. Ex. 104 at 4).    This scheme to fraudulently secure financial guarantees satisfies the first

element of a wire-fraud offense.  *See, e.g.*, *Griffin*, 76 F.4th at 739; *Madeoy*, 912 F.2d at 1492; *see

also St. Gelais*, 952 F.2d at 92, 95–96, 98; *Pasquantino*, 544 U.S. at 356.

Second, O'Brien's "scheme to defraud employed false material representations."  PATTERN

INSTRUCTIONS, *supra*, § 2.57.  O'Brien completed cosigner applications on behalf of herself,

Colwell, Thomas, McClellan, and her mother.  Katherine O'Brien's handwriting is on each of the

applications, and her phone number is listed as the relevant employer contact for Colwell's,

Thomas's, and McClellan's applications.  (Gov. Ex. 89 at 4; Gov. Ex. 90 at 4; Gov. Ex. 91 at 4;

*see* 9/29 Tr. at 154–55, 163–64 (Turner); *see also* Gov. Ex. at 92; Gov. Ex. 104).

O'Brien fabricated much of the information on the cosigner applications she completed.

For example, McClellan testified that she did not fill out or know about the cosigner application

in her name; that she never lived at the address listed on the application; that she had never met

Burros, despite being listed as his friend on the application; that her phone number and email

address were incorrect; that she never met Kedrick Spivey, the significant other listed on her

application; that her mother is neither named Kimberly nor deceased, as reflected on the

application; and that she was not adopted, as the application represents she was.  (9/30 Tr. at 59–

66 (McClellan)).

Kathleen O'Brien's application included similar falsehoods.  O'Brien testified that she did

not fill out her cosigner application or know about it; that her employment information included

several readily apparent misstatements, including errors in the name of the hospital where she worked, the hospital address, her job title, and her income; that she never banked with Chase, as stated in the application; that her father's (and Katherine's grandfather's) name was spelled incorrectly; that other O'Brien-family members' background and contact information was misstated; and that the application included a thumbprint, despite the fact that she had never gone to Aable's office in Houston to be fingerprinted.  (10/1 Tr. at 7–18 (Kathleen O'Brien)).  The falsehoods in these applications compel the finding that Katherine O'Brien also falsified the background information in the Colwell and Thomas cosigner applications that she completed and submitted to Aable.

The employment and income information in these applications was also false.  Fake pay stubs reported false incomes for the cosigners.  McClellan's cosigner application listed her as an intern at On Purpose, (Gov. Ex. 91 at 4), a nonprofit program that provides mental-health and social support services, (9/30 Tr. at 35–36 (Johnson)).  On Purpose's internship program is funded by BakerRipley, (*id.*), a company offering many services in workforce solutions, education, and communities and stability, (9/30 Tr. at 19–20 (Granger)).  McClellan's application included pay stubs that appeared to be from BakerRipley, (Gov. Ex. 91 at 12–13), but McClellan was never an intern at On Purpose, (9/30 Tr. at 61, 66 (McClellan)).  BakerRipley's vice president of human resources, Laura Granger, reviewed McClellan's pay stubs, as well as those in Colwell's and Thomas's applications.  (9/30 Tr. at 19–29 (Granger)).  She testified that BakerRipley's records included no employment or payment information about McClellan, Colwell, and Thomas.  (*Id.*).  Granger also testified that the pay stubs in the cosigner applications for McClellan, Colwell, Thomas, and Katherine O'Brien were not in BakerRipley's records and that they were fake.  (*Id.*; *see* Gov. Exs. 107, 108 (legitimate BakerRipley pay stubs for Katherine O'Brien)).

The pay stubs attached to Kathleen O'Brien's application were also fake and included false income information. (*See* Gov. Ex. 92 at 13, 15). Kathleen O'Brien is a nurse practitioner and worked at Hill Country Memorial Hospital. (10/1 Tr. at 8 (Kathleen O'Brien)). She testified that the pay stubs attached to the cosigner application bearing her name were fake and that her daughter Katherine did not have access to her actual pay stubs. (*Id.* at 16–17 (Kathleen O'Brien)). Alysha Metzger, the vice president of human resources at Methodist Hospital Hill Country, the new name for Hill Country Memorial, also testified that the pay stubs in Kathleen O'Brien's cosigner application were fake. (*Id.* at 2–4 (Metzger)). The pay stubs in the cosigner application had an incorrect name for the hospital; had a different logo; and differed in both form and content from genuine pay stubs. (*Id.* at 3–6 (Metzger); *compare* Gov. Ex. 92 at 13, 15, *with* Gov. Ex. 99).

Katherine O'Brien knew that the cosigner applications she submitted included false information. McClellan and Kathleen O'Brien testified that they did not know about the cosigner applications Katherine O'Brien submitted using their names and that much of the information in them was false. Katherine O'Brien knew how to make fake pay stubs because she had previously made some for a friend who needed proof of employment to return to a shelter for homeless individuals. (*See* Gov. Ex. 85A at 2–3). O'Brien repeatedly acknowledged that she would need to steal identities to meet Aable's cosigner requirements. (*See* Gov. Ex. 87A at 2). In one phone call between O'Brien and Burros, O'Brien told Burros that she would submit fake pay stubs with the cosigner applications. (Gov. Ex. 84A). O'Brien told Burros that "I'm a fake, I'ma fake my mother[*******] life away with that one"; that she could "[c]opy, paste, edit, [and] repeat"; and that her employer "[****]ed up" by "put[ting]" a "lap top into the right hand." (*Id.* at 2). In another recording, O'Brien told Burros that she "kn[e]w how to" complete the cosigner applications, was "going to do it" for Burros, and that she "kn[e]w" to "use different pens" when

28

completing the cosigner applications. (Gov. Ex. 106A at 1). The record evidence shows, beyond a reasonable doubt, that O'Brien knew that the cosigner applications she submitted to Aable contained false information and fake documents.

The false information was material to both Aable's and Financial Casualty's decisions to issue a surety bond and payment guarantee. Aable required cosigners' income to equal the value of the defendant's bond. (Gov. Ex. 4B at 08:40–09:35). Cosigners' employment information and pay stubs were necessary to "bypass the insurance." (*Id.* at 13:00–13:41). O'Brien also knew that accurate cosigner information, especially information about cosigners' income, was important to issuing and guaranteeing surety bonds. O'Brien recounted to law enforcement a conversation she had with Ebony Jenkins, an employee at a bonding company, who told O'Brien that she would need collateral or five cosigners with jobs for Burros's $430,000 bond. (Gov. Ex. at 105A at 6; *see also* 9/29 Tr. at 70 (Kern); 10/1 Tr. at 185 (Hitt)).

Financial Casualty also considers cosigner employment information and income to be the most important information to determining whether it will issue a surety bond, because insurers need to know whether they can recover some money from cosigners in the event of a bond forfeiture. (10/1 Tr. at 31–33, 36–38, 65–69 (Good)). Good testified that, after reviewing the bond materials for Roemello Burros, Financial Casualty would not have approved the Burros bond had it included accurate financial and indemnitor information. (*Id.* at 54–55 (Good)).

The evidence shows beyond a reasonable doubt that O'Brien prepared and submitted to Aable and Financial Casualty cosigner applications containing false information in support of Roemello Burros's bail bond; that she knew the financial information in the applications was false; and that the false information was material to Aable's and Financial Casualty's decisions to guarantee payment to Harris County if Burros forfeited his surety bond.

29

Third, O'Brien "caused to be transmitted by way of wire communications, in interstate commerce," the cosigner applications "for the purposes of executing" her scheme. PATTERN INSTRUCTIONS, *supra*, § 2.57. O'Brien "could reasonably have foreseen the use of the wires" to transmit the bond and cosigner application and related documents. *Richards*, 204 F.3d at 207; *Massey*, 827 F.2d at 1002.

Interstate wires were used to upload the documents for Burros's bond application to a server in Georgia that is maintained by Bond-Pro. (9/30 Tr. at 2–10 (Mendoza); *id.* at 161–67 (Hassan); 10/1 Tr. at 39 (Good); *see* Gov. Ex. 101; Gov. Ex. 102 (demonstrative)). O'Brien could have reasonably foreseen this use of the wires, for the same reasons that applied to Bateson and Gholar. The cosigner documents that O'Brien prepared and submitted to Aable are contracts that provide Aable and Financial Casualty with legal recourse in the event of a forfeiture. The first paragraph of O'Brien's application explains this fact. (Gov. Ex. 104 at 4; Gov. Ex. 89 at 3; Gov. Ex. 90 at 3; Gov. Ex. 91 at 3; Gov. Ex. 92 at 4). State law requires Aable to maintain these cosigner applications for four years. (9/29 Tr. at 79 (Kern); 10/1 Tr. at 60 (Good)); *see also* TEX. OCC. CODE ANN. § 1704.202(d)(3). It was reasonably foreseeable to O'Brien that Aable would have stored these documents in online servers for future use.

The use of the wires was also "incident to an essential part of the scheme" to defraud. *Schmuck*, 489 U.S. at 712 (quoting *Pereira*, 347 U.S. at 8). A reliable means of sending and maintaining cosigner applications and contracts was "an essential part of the scheme" to defraud Financial Casualty. Those documents were essential to Financial Casualty's ability to recover the money that it would owe Harris County if Burros failed to appear. (Gov. Ex. 83; 10/1 Tr. at 40–41, 67–69 (Good)). In addition, state law, as well as Aable's financial contracts with Financial Casualty, required the retention of bond documents, including the cosigner applications, for several

years.  (10/1 Tr. at 48, 60 (Good)).  When Aable uploaded the cosigner documents to Bond-Pro's Georgia server, it provided the means of, and was therefore "incident" to, maintaining records, which was "an essential part" of the scheme to defraud.

O'Brien argues that the government failed to prove this element of the offense because her involvement in the scheme ended by the time Aable uploaded Burros's bond documents to Bond-Pro, and because Kern testified that the bond system is so complicated that laypersons would not know what would happen after they submitted their bond or cosigner applications.  (Docket Entry No. 1422 at 7–9).  These arguments do not succeed.

It does not matter that O'Brien had ended her direct participation in the fraudulent scheme before the fraudulent bond documents she submitted were transmitted over interstate wires.  *See United States v. Ashdown*, 509 F.2d 793, 799 (5th Cir. 1975) ("There is no rule that the money must change hands after the mailing.").  Rather, it matters that the use of the wires was foreseeable to O'Brien and was for the purpose of executing the scheme.  PATTERN INSTRUCTIONS, *supra*, § 2.57; *Richards*, 204 F.3d at 207; *Massey*, 827 F.2d at 1002.  In *Schmuck*, for example, the Supreme Court affirmed a mail-fraud conviction for a defendant who bought used cars, rolled back the odometers to show low mileage, and resold the cars to dealers at inflated prices.  *Schmuck*, 489 U.S. at 707.  The dealers in turn sold the cars to new owners and mailed the title applications to the state departments of transportation to transfer title to the new owners.  *Id.*  The Supreme Court held that a rational jury could find that the scheme depended on the use of the mails to pass the car title to the dealers' customers.  *Id.* at 711–14.  Similarly, in *Ashdown*, the Fifth Circuit upheld a mail-fraud conviction based on annual reports mailed after fraudulent stock sales had occurred, because the reports helped lull investors into keeping the stocks.  509 F.2d at 799–800.  Both cases allowed convictions based on the use of interstate communications that occurred *after* the

fraudulent acts were completed.  *United States v. Swenson*, 459 F. Supp. 3d 819, 826 (S.D. Tex. 2020) (assessing these cases similarly), *aff'd*, 25 F.4th 309 (5th Cir. 2022).

The link to interstate commerce is comparable to the link in *Schmuck*.  The Court upheld the mail-fraud conviction in *Schmuck* because "the registration-form mailings . . . were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme."  489 U.S. at 712.  Here, uploading the cosigner documents in Bond-Pro's Georgia server was essential to the fraudulent scheme.  Without the ability to maintain the cosigner documents, Aable and Financial Casualty could not and would not promise Harris County that they would pay Burros's bond amount if he forfeited it.  There is no need to prove that the use of interstate electronic communications and storage were "necessary" or an essential part of the fraudulent scheme. *Ashdown* makes clear that necessity is not the criteria; the benchmark is whether the post-fraud use of the mails or wires is "in furtherance of the scheme."  509 F.2d at 800.  In *Ashdown*, the mailings "lull[ed] the victim into a false sense of security," helping conceal the fraud.  *Id.*  Here, the online storage in Bond-Pro's servers allowed Aable and Financial Casualty to maintain the bond documents over the time needed to dispose of the underlying cases.  The online transmission and electronic storage of Burros's bond documents furthered the goal of allowing Burros to remain on the bond he obtained using fraudulent cosigner documents.

O'Brien's argument about Kern's testimony that cosigners would not understand the inner workings of the bond process does not undermine the court's findings.  (9/29 Tr. at 76–77 (Kern)).  Kern's years of experience with bail bonds gives him deep and broad knowledge of the intricacies of surety-bond financing, knowledge far beyond that necessary to devise and carry out the scheme at issue here.  (*Id.* at 23–50).  His response to O'Brien's counsel's question on cross-examination does not raise a reasonable doubt as to whether O'Brien knew that cosigner documents were

important financial documents or whether she could reasonably foresee that they would be transported by wires and stored online.  The record evidence proves beyond a reasonable doubt that O'Brien understood that accurate cosigner documents and bond applications were important to those issuing and guaranteeing the bonds.  The documents O'Brien signed explained in easy-to-understand language that cosigner applications are important financial documents.  O'Brien was able to explain to law enforcement officers how cosigner applications were needed to satisfy substantial collateral requirements on the $430,000 bond for Burros.  O'Brien could reasonably foresee that bonding and insurance companies would rely on these documents in deciding whether to issue or underwrite the bond for Burros.  In this electronic age, O'Brien could reasonably foresee that the documents would be transmitted via wire and stored using electronic means.

The government proved beyond a reasonable doubt the third element of wire fraud.

Fourth, O'Brien "acted with a specific intent to defraud."  PATTERN INSTRUCTIONS, *supra*, § 2.57.  O'Brien knew that the income information in the cosigner applications she submitted was false.  She also knew from the first paragraph of the cosigner applications that the false information would result in Burros's release from jail on an Aable bond.  The record shows beyond a reasonable doubt that O'Brien acted with the intent to "deceive," through Aable, Financial Casualty and "cheat" it out of a substantial financial guarantee.  *Perez-Gorda*, 115 F.4th at 656.

Based on the evidence presented, and after weighing the credibility of the witnesses' testimony, the court finds, beyond a reasonable doubt, that O'Brien committed wire fraud, as alleged in Count 46 of the superseding indictment.

## 2.    Conspiracy to Commit Wire Fraud (Count 45)

The government proved beyond a reasonable doubt that Katherine O'Brien committed each element of the conspiracy offense alleged in Count 45 of the superseding indictment.

First, O'Brien and Burros, "agreed to commit the crime of" wire fraud. PATTERN INSTRUCTIONS, *supra*, § 2.15A. Phone calls between O'Brien and Burros show that O'Brien agreed to help Burros obtain a surety bond by submitting to Aable false cosigner information, including fake pay stubs. (Gov. Ex. 84A at 2; Gov. Ex. 106A at 1).

Second, O'Brien "knew the unlawful purpose of the agreement and joined in it . . . with the intent to further the unlawful purpose." PATTERN INSTRUCTIONS, *supra*, § 2.15A. Because O'Brien submitted a cosigner application with false information and fake attachments for Burros, she knew the fraudulent nature of the conspiracy when she agreed to join it and to further it. O'Brien told Burros that "I'm a fake, I'ma fake my mother[*******] life away with that one"; that she could "[c]opy, paste, edit, [and] repeat"; and that her employer "[****]ed up" by "put[ting]" a "lap top into the right hand." (Gov. Ex. 84A at 2). O'Brien also told Burros that she knew to conceal the fact that she completed the different cosigner applications by using different pens. (Gov. Ex. 106A at 1). O'Brien knew the fraudulent goal of the conspiracy and joined in it with the intent to further that goal.

Third, O'Brien "knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy." PATTERN INSTRUCTIONS, *supra*, § 2.15A. O'Brien submitted the false cosigner documents to Aable, (Gov. Exs. 89–92, 104), which caused Burros's surety bond to be approved, (Gov. Ex. 83; 10/1 Tr. at 54–55 (Good)). O'Brien took an overt act in furtherance of the conspiracy.

Based on the evidence presented, and after weighing the credibility of the witnesses' testimony, the court finds, beyond a reasonable doubt, that O'Brien conspired to commit wire fraud, as alleged in Count 45 of the superseding indictment.

### 3.    Duress (Counts 45 and 46)

O'Brien argues that notwithstanding the government's proof that she committed wire fraud and conspired to commit wire fraud, the court should find her not guilty because she committed these crimes under duress.  O'Brien argues that Burros compelled her to bond him out of jail under threat of death or severe bodily injury.  The evidence that Burros consistently and horrifically abused O'Brien is clear but is not legally sufficient to meet the imminence element of a duress defense.

Witnesses testified to the abuse that O'Brien suffered at the hands of Burros.  O'Brien's mother testified that she "would never do anything to help" Burros because of his abuse.  (10/1 Tr. at 9 (Kathleen O'Brien)).  She described incidents in which her daughter returned home "with her eye swollen shut and her face all swollen" and in which Burros "broke" Katherine's "forehead, her skull," with "the butt of a screwdriver." (*Id.* at 9, 19 (Kathleen O'Brien)).  Katherine O'Brien's sister testified that Burros "split" Katherine's "head open with a gun" and "threatened to kill" her "on more than one occasion."  (10/3 Tr. at 53 (Kerie O'Brien)).  Burros "was pimping" Katherine "out" for sex by posting pictures online.  (*Id.* at 52 (Kerie O'Brien)).  Katherine O'Brien's sister described how, in the pictures, Katherine O'Brien "was bruised black and blue" on the "whole back of her legs, her bum," and "her arms."  (*Id.* at 52–53 (Kerie O'Brien)).  Katherine O'Brien's friends, David Wiggins and Elijah Jackson, also testified to seeing signs of abuse and to her fear of Burros.  (*Id.* at 58–60, 62–63 (Wiggins); *id.* at 66–67 (Jackson)).  The court credits the testimony that Burros "constructed a system of abuse around" Katherine O'Brien.  (*Id.* at 59 (Wiggins)).

Crediting the testimony in support of O'Brien is not enough to establish duress by a preponderance of the evidence.  To establish duress, O'Brien must prove that she reasonably feared an "imminent" threat of serious bodily injury to herself or a family member, and that she had no

"reasonable opportunity both to refuse to" commit wire fraud "and also to avoid the threatened harm." PATTERN INSTRUCTIONS, *supra*, § 1.38. O'Brien must have been "in serious danger 'at the moment'" she committed the offenses. *Mora-Carrillo*, 80 F.4th at 716 (quoting *Harper*, 802 F.2d at 118). The record does not support that finding by a preponderance of the evidence.

When O'Brien falsified the cosigner documents and submitted them to Aable, Burros was in the Harris County Jail. (*See* Gov. Ex. 84–88 (jail calls between Burros and O'Brien)). While incarcerated, Burros posed no imminent threat to O'Brien's safety or that of her family members. The record does not establish that Burros's release was imminent. The evidence does not show that if O'Brien had adhered to the law, that decision would have created "a real emergency leaving [her] no time to pursue any legal alternative." *Posada-Rios*, 158 F.3d at 874; *see Mora-Carrillo*, 80 F.4th at 716 (holding that a four-day gap between a threat of violence and illegal activity, without evidence of continuing danger in the interim, was insufficient to raise a jury question on duress).

O'Brien attempted to demonstrate Burros's immediate threat by eliciting testimony that Burros threatened her while he was in jail. (*See* 10/3 Tr. at 56 (Kerrie O'Brien)). Wiggins, O'Brien's friend, testified to his belief that Burros had "connections" outside prison who would harm O'Brien if Burros so instructed. (*Id.* at 63–64 (Wiggins)). Wiggins's testimony is not persuasive. Wiggins had never met Burros and had no personal knowledge of Burros's connections outside prison. (*See id.*). Wiggins agreed that Burros "could not physically threaten" O'Brien because he was in jail. (*Id.*). Wiggins could not "say exactly" how Burros posed an imminent threat to O'Brien. (*Id.* at 64 (Wiggins)). The absence of evidence showing a threat of imminent harm to O'Brien or her family if she did not conspire to commit wire fraud and commit wire fraud preclude a finding that she acted under duress.

O'Brien did not establish her duress defense by a preponderance of the evidence.

## IV.    Verdict

Kamaiga Gholar is **GUILTY** of committing wire fraud and conspiring to commit wire fraud, as charged in Counts 14 and 9 of the superseding indictment.

James Bateson is **GUILTY** of committing wire fraud and conspiring to commit wire fraud, as charged in Counts 42 and 39 of the superseding indictment.

Katherine O'Brien is **GUILTY** of committing wire fraud and conspiring to commit wire fraud, as charged in Counts 46 and 45 of the superseding indictment.

## V.    Conclusion

The court finds all three defendants guilty, beyond a reasonable doubt, of committing wire fraud and of conspiring to commit wire fraud, as charged in the superseding indictment.  The defendants may remain on bond pending sentencing, with the current bond conditions to remain in effect.  The court will separately enter orders with dates for presentence investigation reports and sentencing for each of the defendants.

SIGNED on October 15, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge